RICHARD WILLIAM LAWLESS *v.* DIRECTOR, PATUXENT INSTITUTION

[No. 1037, September Term, 1974.]

*Decided July 7, 1975.*

454

The cause was argued before ORTH, C. J., and DAVIDSON and LOWE, JJ.

*David E. Manoogian, Assigned Public Defender,* with whom were *MacDonald & Manoogian* on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Donald R. Stutman, Assistant Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Jerome C. Schaefer, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

The issues are too clear and the law too well settled to require extended factual synopses or lengthy legal analyses to arrive at our result. Richard William Lawless, a young man whose name is not new to appellate reports, was received in Patuxent Institution for examination December, 1969, by order of the Circuit Court for Montgomery County. There followed a series of legal attempts by appellant to overcome that referral. These attempts covered a two year period. Following their unsuccessful conclusion, the State requested a hearing on September 15, 1972 presumably based upon the Diagnostic Staff Report dated August 22, 1972.

There was an unexplained hiatus of more than two years before the trial was finally held on December 12, 1974, before a jury of the Circuit Court for Montgomery County. Dr. Charles Cherry, a staff psychologist, was the only State witness. Through him the Patuxent records relating to Mr.

Lawless and the August 22, 1972 evaluation report were introduced. A full reading of the record reveals that Mr. Lawless consistently refused examination and it appears the Patuxent officials acquiesced in that refusal.

Dr. Cherry's testimony clearly revealed that he did not personally examine Lawless and he further indicated that neither had the director nor the resident psychiatrist who also signed a Diagnostic Staff Report on Lawless dated August 22, 1972. Dr. Cherry admitted he had not even seen Lawless in over a year. He testified that his evaluation, and inferentially that of all the staff members who signed the report, was made on the strength of Lawless's record which contained prior examination reports and evaluation from the Clifton T. Perkins Institution.

At the close of the State's case appellant moved for a directed verdict grounded upon the State's failure to show compliance with Md. Code, Art. 31B, Sec. 7 which requires that an evaluation of defective delinquency shall be upon examination

" . . . made by at least three persons on behalf of the institution for defective delinquents, one of whom shall be a medical physician, one a psychiatrist, and one a psychologist. . . ."

This examination, following a compilation of pertinent information about the person to be examined, provides the basis for the staff determination.

"On the basis of all the assembled information, *plus their own personal examination, and study of the said person,* they shall determine whether in their opinion, or in the opinion of a majority of them, the said person is or is not a defective delinquent. . . ." [Emphasis added].

Although comprehending the purport of appellant's motion, the trial judge utilized Dr. Cherry's testimony to explain that the Patuxent officials' interpretation of the

statute was contrary to the statute's words. Unfortunately the judge adopted that interpretation.

"As I understand his motion, though, as presented, is that there was no personal examination in the prescribed review by—by prescribed I mean that prescribed by the Staff, and that is not in conformity with the decisional law on this matter now. They have determined that the phrase used in the statute is, does not mean that, that it is necessary to have a personal examination, and that it is appropriate to present this matter at the staff evaluation in the form of prior reports, and which have been reviewed by the staff and wherein their opinion, those prior reports, broad enough in significance, enough for them to make the finding that they have declared, and in this case the staff which included a physician-psychiatrist and a psychologist, that they concluded from all of the available evidence that they had, accumulated records and recent past examinations, that they had an opinion.

Now, under those circumstances, particularly where it was buttressed by the testimony from the psychologist who participated in that, that it was not merely a matter of having prior reports and evaluations available, but weighing and considering them, there was no necessity deemed by the Institution to seek the examination which might be undertaken by way of contempt and whether or not they are correct in their determination or the method that they used to proceed to determine it and the value of it is a matter for the jury to decide, and the motion must be overruled because I can't indulge in the propensity that I might have to weigh the evidence."

That ruling would have been in accord with our opinion in *State v. Weeder*, 22 Md. App. 249, where we held such diagnosis could not be frustrated by an uncooperative

inmate if the diagnosis could be based on historical data. However, on May 7, 1975 the Court of Appeals reversed us in *Weeder v. State*, 274 Md. 626, and flatly held that our Court ". . . was incorrect in its necessarily implied conclusion that a commitment could be based solely on a patient's prior medical record."

As if in direct response to the trial judge's holding here, Judge Singley wrote for the Court:

> "In our view, the examination mandated by Art. 31B, Sec. 7 (a) cannot be finessed simply because an inmate declines to be interviewed. We do not propose here to delineate with any precision the alternate procedures to be followed by the medical, psychiatric and psychological team, because we regard this as far beyond the horizons of judicial expertise. It occurs to us, however, that at a minimum the report of the staff should include relevant information from the study made by the social worker, a summary of the inmate's prior arrests and convictions, incident reports, disciplinary infractions, observations made by guards, fellow inmates and staff, and at least a minimal personal confrontation between the inmate and staff.

> \* \* \*

> It seems to us that the time has come when a clear delineation must be made between an interview and the term 'personal examination and study' used in Art. 31B, Sec. 7 (a). The statutorily mandated examination normally contemplates both an interview and observation. The recalcitrant inmate, who refuses to talk does not necessarily insulate himself from examination, however. He may still be observed and studied, and, in a proper case, a valid diagnosis reached."

The Court of Appeals quoted from *McNeil v. Director*, 407 U. S. 245, 251-252 to reaffirm the possibility of making such

an evaluation despite an inmate's refusal to cooperate. The requisites recited by *Weeder, supra,* as "a minimum the report of the staff should include" were for the most part complied with here save the last set forth:

" . . . and at best a minimal personal confrontation between the inmate and staff."

Our reversal is based upon a total absence of even "minimal personal confrontation between inmate and staff"; however, compliance with our remand will be less clear. Like the Court of Appeals

"We do not propose to delineate with any precision the alternate procedures to be followed by the medical, psychiatric and psychological team, because we regard this far beyond the horizons of judicial expertise." *Weeder, supra.*

Appellant raised three other issues, response to which yields to our reversal here. However, since there was a preliminary Motion Ne Recipiatur and To Strike filed by appellee, we find it more orderly to respond to that motion.

The motion was for the court not to receive and to strike affidavits of jurors reciting reasons for their verdicts, which reasons formed a basis for a dual attack upon the verdict by appellant. We unhesitatingly grant the motion to reject that which was not a part of the record on appeal, Md. Rule 1026 c and represented an issue which had not been tried and decided by the lower court. Md. Rule 1085. Even the substance of that attack, founded as it were upon jurors' renunciations, is not an issue upon which the case law is equivocal:

"[I]n Maryland it is 'well settled that a juror cannot be heard to impeach his verdict, whether the jury conduct objected to be misbehavior or mistake. *Browne v. Browne,* 22 Md. 103, 113. The reasons for the rule have been stated by this Court in *Brinsfield v. Howeth,* 110 Md. 520, 530, in these impressive words: 'Such evidence is forbidden by

public policy, since it would disclose the secrets of the jury room and afford an opportunity for fraud and perjury. It would open such a door for tampering with weak and indiscreet men that it would render all verdicts insecure; and, therefore, the law has wisely guarded against all such testimony and has considered it unworthy of notice. It would be a most pernicious practice, and in its consequences dangerous to this much valued mode of trial, to permit a verdict, openly and solemnly declared in the Court, to be subverted by going behind it and inquiring into the secrets of the jury room.' " *Christ v. Wempe*, 219 Md. 627, 641. For an in depth discussion on this point, see J. Gilbert's opinion in *Dixon v. State*, 27 Md. App. 443.

> *Judgment reversed.*
> *Case remanded for retrial following evaluation in compliance with Weeder v. State, 274 Md. 626.*